# Exhibit A

COPY

1  JESSE W. MARKHAM, JR. (CA SBN 87788)
   WILLIAM L. STERN (CA SBN 96105)
2  JENNIFER LEE TAYLOR (CA SBN 161368)
   KEITH L. BUTLER (CA SBN 215670)
3  MORRISON & FOERSTER LLP
   425 Market Street
4  San Francisco, California 94105-2482
   Telephone: 415.268.7000
5  Facsimile: 415.268.7522
   JMarkham@mofo.com
6
   Attorneys for Plaintiff
7  Coalition For ICANN Transparency Inc.

8
                    UNITED STATES DISTRICT COURT
9
                 NORTHERN DISTRICT OF CALIFORNIA
10
                        SAN JOSE DIVISION
11

12

13  COALITION FOR ICANN                    Case No.
    TRANSPARENCY INC., a Delaware
14  Corporation,
                                           **COMPLAINT FOR VIOLATION OF**
15              Plaintiff,                  **THE ANTITRUST LAWS,**
                                           **CALIFORNIA BUSINESS &**
16         v.                              **PROFESSIONS CODE SECTION**
                                           **17200, AND THE LANHAM ACT;**
17  VERISIGN, INC., a Delaware             **INTENTIONAL INTERFERENCE**
    Corporation; INTERNET                  **WITH PROSPECTIVE ECONOMIC**
18  CORPORATION FOR ASSIGNED               **ADVANTAGE; AND**
    NAMES AND NUMBERS, a                   **DECLARATORY AND**
19  California Corporation,                **INJUNCTIVE RELIEF**

20              Defendants.

21

22

23

24

25

26

27

28

COMPLAINT
sf-2037455

                                                    EXHIBIT A

1    Plaintiff Coalition for ICANN Transparency Inc. ("CFIT") brings this action

2   against Internet Corporation for Assigned Names and Numbers ("ICANN") and VeriSign, Inc.

3   ("VeriSign"), and alleges as follows:

4                              **NATURE OF THE ACTION**

5    1.    ICANN is responsible for coordinating the Internet domain name system ("DNS")

6   and operates pursuant to a charter granted it by the United States Department of Commerce.  Its

7   chief mandate is the promotion of competition in the Internet domain name system.  ICANN is

8   prohibited from "unjustifiably or arbitrarily" injuring "particular persons or entities or particular

9   categories of persons or entities" and is required to "act in a non-arbitrary and reasonable manner

10  with respect to . . . any . . . activity related to the DNS project."  Unfortunately, ICANN has

11  strayed from its mission and, unless enjoined, is threatening to do the very things its charter

12  prohibits.

13   2.    This is an action to preserve the status quo in markets related to Internet domain

14  names, and to prevent VeriSign from expanding its monopoly control over the .com and .net

15  domain name registries into downstream and adjacent markets.  Plaintiff seeks an injunction

16  against the signing and implementation of a proposed .com Registry Agreement between ICANN

17  and VeriSign (the "2005 .com Agreement"); an injunction against VeriSign's monopoly

18  leveraging conduct as specified herein; an injunction requiring ICANN to adhere to its

19  governmental mandate to maintain competition and prevent discrimination in markets related to

20  Internet domain names; and an injunction requiring VeriSign and ICANN to abide by the terms of

21  the current .com agreement (the "2001 .com Agreement") until it expires and requiring ICANN to

22  entertain competing bids for the operation of the .com registry at that time.  Plaintiff also requests

23  declaratory relief that the agreements and understandings between the defendants, as reflected in

24  the terms of the 2005 .com Agreement, as well as the similar "2005 .net Agreement," constitute

25  violations of federal and state antitrust laws and state unfair competition laws, and ordering

26  appropriate relief to restore competitive conditions in affected markets.

27   3.    As explained more fully below, ICANN has abrogated its government-mandated

28  obligation to maintain competition and prevent discrimination in markets related to Internet

COMPLAINT                                                                                1
sf-2037455

1    domain names by acquiescing and colluding in VeriSign's strong-arm tactics to leverage its

2    limited-duration contractual monopoly over the .com and .net Internet domain name registries

3    into a permanent monopoly over those registries and over adjacent and downstream markets for

4    various domain name services.  Specifically, in awarding VeriSign the contractual right to operate

5    the .com and .net registries, ICANN agreed to contract-renewal terms with VeriSign that have the

6    practical effect of installing VeriSign as the permanent operator of the .com and .net registries,

7    which permits VeriSign to extract supra-competitive prices from consumers transacting business

8    with the registries.  Then, having acquiesced in VeriSign's consolidation of permanent registry

9    monopolies, ICANN agreed to contract terms with VeriSign that permit the extension of

10   VeriSign's monopoly control to the downstream market for the registration of expiring domain

11   names, which permits VeriSign to extract supra-competitive prices from consumers registering

12   domain names.  ICANN has also agreed to contract terms with VeriSign that permit the extension

13   of VeriSign's monopoly control of the registries to the adjacent market for the provision of

14   domain name directory assistance, which permits VeriSign to charge supra-competitive prices for

15   advertising and other services offered through directory assistance sites, and to drive rivals out of

16   that line of business.

17        4.    VeriSign's conduct makes it abundantly clear that it has no intention of reining in

18   its illegal monopolistic imperialism until it has conquered every market related to Internet domain

19   names.  ICANN's conduct makes it clear that it is unable or unwilling to put a stop to VeriSign's

20   "monopoly-creep."  In fact, ICANN is now colluding in the promotion of VeriSign's

21   monopolistic scheme in exchange for a share of the monopoly profits.  Plaintiff, therefore, on

22   behalf of its members, requests that this Court intervene and prevent ICANN and VeriSign from

23   eliminating competition in the markets related to Internet domain names.

24                                    **PARTIES**

25        5.    ICANN is a private not-for-profit corporation, organized and existing under the

26   laws of the State of California, and having its principal place of business in Marina Del Rey,

27   California.  ICANN is responsible for providing technical coordination of the Internet domain

28   name system.

COMPLAINT
sf-2037455

2

1    6.    VeriSign is a corporation, organized and existing under the laws of the State of

2    Delaware, and having its principal place of business in Mountain View, California.  VeriSign

3    currently acts under contract with ICANN as the "registry" for all .com and .net domain names.

4    7.    CFIT is a not-for-profit membership corporation, organized and existing under the

5    laws of the State of Delaware, and having its principal place of business in the District of

6    Columbia.  Members of CFIT include certain Internet domain name registrars, registrants, back

7    order service providers, and other Internet stakeholders.

8                                **JURISDICTION AND VENUE**

9    8.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331

10   and 1337; 15 U.S.C. §§ 15 and 26; the Declaratory Judgment Act, 28 U.S.C. § 2201; and

11   principles of supplemental jurisdiction under 28 U.S.C. § 1367.

12   9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) and 15

13   U.S.C. § 22, in that defendant VeriSign resides, transacts business, and is found in this district

14   and defendant ICANN resides, transacts business, and is found in the State of California and this

15   district.

16   10.   **Intradistrict Assignment**:  A substantial part of the events giving rise to CFIT's

17   claims occurred Santa Clara County, California, where defendant VeriSign has its principal place

18   of business.  Assignment to the San Jose division is therefore proper.

19                                **RELEVANT MARKETS**

20   11.   For purposes of CFIT's antitrust claims, the relevant product markets include the

21   following:

22       1.    The markets for the purchase and sale of domain name registrations (the

23            "Domain Name Registration Markets"), which include:

24            (a)    The market for .com domain name registrations (the ".com

25                   Registration Market").

26            (b)    The market for .net domain name registrations (the ".net

27                   Registration Market").

28

COMPLAINT
sf-2037455

3

1    (c)    The .com and .net Registration Markets are the markets in which

2    VeriSign, and VeriSign alone, sells .com and .net registrations to registrars

3    on behalf of their end-user customers.  VeriSign is permitted to operate in

4    these markets solely by virtue of being a party to the .com and .net

5    agreements.

6    2.    The market for services used by end users in the purchase and sale of

7    expiring domain name registrations (the "Expiring Names Registration Services

8    Market").  The Expiring Names Registration Services Market includes various

9    services that are bought by end users to register domain names when they expire

10    on the .com and .net registries.  The relevant services include, without limitation,

11    "back order" services that assist registrars in acquiring expiring domain names for

12    registration on behalf of clients (potential and actual registrants), and auctions

13    through which expiring domain name registrations are released to the public for

14    bidding.

15    3.    The market for Web address directory assistance services (the "Directory

16    Assistance Services Market").  The Directory Assistance Services Market includes

17    the market for provision of services to assist Internet users trying to find particular

18    web sites.

19    12.    The relevant geographic market as to each relevant product market is the world.

20    **INTERSTATE COMMERCE**

21    13.    The conduct of defendants VeriSign and ICANN complained of herein will take

22    place in and affect interstate trade and commerce of the United States in that the purchases and

23    sales of services in the relevant markets are transacted across state lines.

24    14.    The conduct of defendants VeriSign and ICANN complained of herein will

25    directly, substantially, and foreseeably affect interstate trade and commerce in that defendants

26    will obstruct free and open competition in the .com and .net Registration Markets, the Expiring

27    Names Registration Services Market, and the Directory Assistance Services Market.

28

COMPLAINT
sf-2037455

4

**BACKGROUND**

1

2    **I.    THE INTERNET DOMAIN NAME SYSTEM**

3        15.    The Internet is a network of interconnected computers and computer networks.

4    Every computer connected directly to the Internet has a unique numerical address. These

5    addresses, which are known as Internet Protocol ("IP") addresses, are necessary for computers to

6    "communicate" with each other over the Internet. An example of an IP address is

7    64.233.161.147.

8        16.    Because numerical IP addresses can be cumbersome and difficult for Internet users

9    to remember or to use, the numerical IP address system has been overlaid with a more "user-

10   friendly" system of domain names, the DNS. Under this system, a single alphanumeric domain

11   name is associated with a specific IP address. For example, the IP address 64.233.161.147 is

12   more commonly known as google.com.

13       17.    Internet domain names consist of "domains" separated by periods. "Top-level"

14   domains, or "TLDs," are found to the right of the period final and include (among others) ".com,"

15   ".gov," ".net," and ".biz," which are sometimes referred to as "generic" TLDs or "gTLDs."

16   "Second-level" domains are those domains immediately to the left of the top-level domains, such

17   as "uscourts" in "uscourts.gov."

18       18.    Because domain names are essentially "addresses" that allow computers connected

19   to the Internet to communicate with each other, each domain name must be unique, even if it

20   differs from another domain name by only one character (*e.g.*, cook.com is different from

21   cooks.com). A given domain name, therefore, can be registered to only one entity.

22       19.    To ensure that each domain name is associated with the correct IP address, each

23   TLD has a single "registry" that maintains a central database of domain names and associated IP

24   addresses within the TLD. VeriSign maintains the registry for .com and .net domain names. A

25   domain name is created by an individual or organization that registers the domain name, thereby

26   causing the registry's database to associate the domain name with the individual or organization's

27   IP address.

28

COMPLAINT
sf-2037455

20.    The .com and .net domain names are the dominant domain names in their categories in the United States. The .com domain names are the primary commercial domain names and dominate the market for such names used for purposes of United States commerce. Similarly, the .net domain names are the dominant names used for general networking purposes, such as personal web sites. Other common domain names, such as .gov and .edu, are not permitted for commercial or general networking purposes.

21.    The individual or organization that registers a specific domain name is a "registrant." Registrants do not have direct access to the registry's database. Instead, prospective registrants must register a domain name through a "registrar," of which there are hundreds. Registrars handle the technical details of registering domain names in the registry.

22.    The process through which registrars acquire the registration rights in .com and .net domain names is automated: Qualified registrars are granted a limited number of connections to VeriSign's registry computers. To register a domain name, a registrar sends an "add" command to VeriSign's registry computer; if the name is available, the "add" command is accepted, and the registrar may register the name on behalf of a registrant.

23.    Because there is competition for many .com domain names that have already been registered, registrars typically send rapid-fire "add" commands through their several connections hoping to be the lucky one to have an "add" command accepted in the event that the registration for that domain name expires and is released. The system functions, in essence, like a lottery; one of the potentially millions of "add" commands sent to the registry by registrars will be the lucky one – the lottery winner.

24.    Because the probability of successfully adding a domain name increases with the number of "add" commands sent, and the number of "add" commands that can be sent increases with the number of connections to VeriSign's computers, the industry quickly recognized that the more registrars participating in the domain name lottery on behalf of a client, the greater the chance of success. A number of "back order service providers" emerged whose function in the marketplace is to partner with several registrars so that when one of the registrars receives an order from a client, the back order provider can arrange to have all its partner-registrars

COMPLAINT
sf-2037455

6

1    participate in the lottery on behalf of the client and increase the likelihood of winning the domain

2    name lottery. If successful, the back order service provider and its partner-registrars all share

3    appropriately in the registration fee charged to the client.

4          25.    In the United States, .com domain names are essential for a vast majority of

5    businesses. Recognizable (and hence usable) .com domain names are in limited supply. Web site

6    owners who want a particular domain name that is already registered typically monitor a list of

7    registered names that will soon expire. When a potential registrant sees that a particular domain

8    name has not been renewed and is about to expire and be released, the potential registrant can

9    contact his or her registrar and "back order" the domain name. The registrar will work with its

10   back order service provider to attempt to register the domain name when it is released by

11   VeriSign. VeriSign's system automatically releases the expired domain names daily, starting at

12   2:00 p.m. Eastern time and continuing until the expired domain names are all released. In the

13   meantime, the back order service providers who have orders for any of the domain names to be

14   released on a particular day will use all of their pooled registry connections to attempt to register

15   the domain names on behalf of registrants. Thus, if a back order service provider has seventy

16   permitted connections, all seventy connections will attempt to register the domain names their

17   registrants want as they are released by VeriSign. The back order service provider that is

18   successful in obtaining a domain name sought by a registrant will then turn the domain name over

19   to the registrar through which the potential registrant placed the back order. If there is more than

20   one back order placed on a particular domain name through a particular back order service

21   provider, the back order service provider may put the domain name up for auction on its web site.

22         26.    The back order service is a robust and competitive business, with millions of

23   dollars in revenue and hundreds of registrars competing in the market. In some instances, no

24   back order service is required, and in those transactions recent prices have ranged approximately

25   between $6.95 and $7.50 to register a new or previously released domain name. Of this, VeriSign

26   and ICANN collect $6.25 ($6.00 to VeriSign and $0.25 to ICANN) for the registration of each

27   .com domain name and $4.25 ($3.50 to VeriSign and $0.75 to ICANN) for each .net domain

28   name, which amount is set pursuant to the current .com and .net registry agreements that VeriSign

COMPLAINT                                                                                    7
sf-2037455

1   has with ICANN. The balance is retained by the new owner's registrar. When a domain name is

2   considered valuable, it is likely to be registered through use of a back order service. Recent

3   competitive prices for these services have been in the range of $60. Of this, VeriSign collects

4   $6.00 for the registry fee for .com domain names and $4.25 for .net domain names. The

5   remaining amount is split between the back order service provider and all of its registrar partners.

6   Under current competitive conditions, it is common for the back order service provider to retain

7   (after deducting VeriSign's fee) 50% of the amount and for the registrar partners to split the

8   remaining 50%. If a domain name is auctioned by a back order service, the amounts are split in

9   the same fashion. VeriSign still receives its set $6.00 or $4.25 registry fee, the back order service

10   provider still receives 50% of the auction price (after deducting $6.00 or $4.25) and the registrar

11   partners still split the remaining 50% of the auction price (after deducting $6.00 or $4.25).

12   **II.     ICANN'S ROLE IN THE INTERNET DOMAIN NAME SYSTEM**

13         27.    ICANN was established pursuant to a Department of Commerce ("DOC")

14   initiative to provide technical coordination of the Internet's domain name system. ICANN

15   operates under a Memorandum of Understanding (the "MOU") with the DOC. The MOU is

16   effectively ICANN's charter, an enabling regulation that established ICANN. The promotion of

17   competition in the domain name system is one of the MOU's central principles. The MOU states

18   in pertinent part:

19         1.    "This Agreement promotes the management of the DNS in a manner that

20              will permit market mechanisms to support competition and consumer choice in the

21              technical management of the DNS. This competition will lower costs, promote

22              innovation, and enhance user choice and satisfaction."

23         2.    Section V. D.2 of the MOU prohibits ICANN from "unjustifiably or

24              arbitrarily" injuring "particular persons or entities or particular categories of

25              persons or entities."

26         3.    Section V. D.3 of the MOU requires ICANN to "act in a non-arbitrary and

27              reasonable manner with respect to … any … activity related to the DNS project."

28

28.     The original MOU was scheduled to terminate on September 30, 2000, and has been amended six times. The most recent amendment, which was entered into on or around September 17, 2003, is scheduled to terminate on September 30, 2006. In this amendment, the DOC reaffirmed "its policy goal of privatizing the technical management of the DNS in a manner that promotes stability and security, competition, coordination, and representation." Additionally, ICANN reaffirmed "its commitment to maintaining security and stability in the technical management of the DNS, and to perform as an organization founded on the principles of competition, bottom up coordination, and representation."

29.     ICANN's bylaws also explicitly recognize "core values," which "should guide the decisions and actions of ICANN," including:

> 1.    "Where feasible and appropriate, depending on market mechanisms to promote and sustain a competitive environment."
>
> 2.    "Introducing and promoting competition in the registration of domain names where practicable and beneficial in the public interest."

## III.    ICANN'S CONTRACTS WITH VERISIGN

### A.    The 2001 .com and .net Agreements

30.     VeriSign has been awarded by ICANN the exclusive contractual right to maintain the registries for the two most important domain names – .com and .net. VeriSign operates these registries under contractual authorization from, and with oversight by, ICANN, consistent with the DOC mandate that in turn governs ICANN. The 2001 .com and .net Agreements carefully balance the needs and interests of ICANN, VeriSign, and other members of the Internet community.

31.     On or about May 25, 2001, VeriSign and ICANN entered into the 2001 .com Agreement with respect to VeriSign's operation of the .com registry and the 2001 .net Agreement with respect to VeriSign's operation of the .net registry.

32.     The 2001 .com Agreement is set to expire on November 10, 2007, but provides that VeriSign may submit a written proposal to extend the agreement between November 10, 2005, and May 10, 2006. ICANN is required to consider this proposal for a period not to exceed

1    six (6) months "before deciding whether to call for competing proposals from potential successor

2    registry operators." VeriSign "shall be awarded a four-year renewal term" unless ICANN

3    determines that VeriSign is in material breach of the 2001 .com Agreement, or the proposal to

4    extend the agreement contains a maximum price that exceeds the price allowed under Section 22

5    of the 2001 .com Agreement or certain other conditions apply. This four-year renewal term, if

6    granted, would expire on November 10, 2011. As discussed more fully below, VeriSign has

7    engaged in conduct that ICANN claimed breached the 2001 .com Agreement. Therefore, absent

8    the 2005 .com Agreement, ICANN could refuse to grant VeriSign the four-year renewal and

9    require competitive bidding for operation of the .com registry in 2007. Furthermore, if VeriSign

10   offered the 2005 .com Agreement as a renewal proposal in 2007, it would allow ICANN to

11   require competitive bidding for operation of the .com registry at that time because the 2005 .com

12   Agreement's price provision exceeds the maximum price under the 2001 .com Agreement.

13       33.    The 2001 .net agreement expired on June 30, 2005. The agreement established a

14   procedure by which ICANN was to select as a successor operator of the .net registry "the eligible

15   party that it reasonably determines is best qualified to perform the registry function . . . taking

16   into account all factors relevant to the stability of the Internet, promotion of competition, and

17   maximization of consumer choice . . . ."

18       34.    Under both the 2001 .com Agreement and the 2001 .net Agreement, VeriSign is

19   required to provide "Registry Services" to ICANN-accredited registrars in a manner meeting the

20   performance and functional specifications attached to the agreement. "Registry Services" are

21   defined in the 2001 .com Agreement as follows:

22           "Registry Services" means services provided as an integral part of
             the Registry TLD, including all subdomains. These services
23           include: receipt of data concerning registrations of domain names
             and nameservers from registrars; provision to registrars of status
24           information relating to the Registry TLD zone servers,
             dissemination of TLD zone files, operation of the Registry zone
25           servers, dissemination of contact and other information concerning
             domain name and nameserver registrations in the Registry TLD,
26           and such other services required by ICANN through the
             establishment of Consensus Policies as set forth in Definition 1 of
27           this Agreement.

28

COMPLAINT                                                                        10
sf-2037455

1     The 2001 .net Agreement contains a substantially similar definition of "Registry Services."

2        35.     Under both the 2001 .com Agreement and the 2001 .net Agreement, VeriSign is

3     also obligated to comply with "Consensus Policies," which consist of specifications and policies

4     established on the basis of a consensus among Internet stakeholders represented in the ICANN

5     process, as demonstrated by compliance with detailed procedures prescribed in the agreement.

6        36.     Appendix G to both the 2001 .com Agreement and the 2001 .net Agreement sets

7     forth the maximum prices VeriSign can charge for specified services.  Among other things,

8     Appendix G sets a maximum price of six dollars ($6.00) per year for registration of a domain

9     name and six dollars ($6.00) per year for renewal or extension of the registration of a domain

10     name.  In addition, for each one-year domain name registration a "registry-level transaction fee"

11     of $0.25 is charged and paid to ICANN.  Under the 2001 .com Agreement, a registrar currently

12     pays $6.00 per year to register each domain name registered with VeriSign.  The registrar also

13     pays $0.25 to ICANN for the registry-level transaction fee.  Any amount above $6.25 that is

14     charged to the registrant is kept by the registrar.  Although the same fee structure was used in the

15     2001 .net Agreement, these fees have now changed for .net domain names pursuant to the 2005

16     .net Agreement, discussed below.

17        37.     Appendix I to both the 2001 .com Agreement and the 2001 .net Agreement

18     includes a Code of Conduct.  Under the Code of Conduct, VeriSign is obligated to "at all times

19     strive to operate as a trusted and neutral third-party provider of Registry Services."  Among other

20     obligations, the Code of Conduct requires VeriSign to treat all ICANN-accredited registrars

21     equally and to give them equivalent access to the registry and prohibits VeriSign from

22     warehousing or registering domain names in its own right other than through an ICANN-

23     accredited registrar.

24        38.     Appendix W to both the 2001 .com Agreement and the 2001 .net Agreement

25     provides that VeriSign will expend a minimum of two hundred million dollars ($200,000,000)

26     "for research, development, and infrastructure improvements to the .com, .net, and .org

27     Registries" between May 25, 2001, and December 31, 2010.  VeriSign is also required to "ensure

28     that a substantial portion of expenditures for the Improvements occurs prior to November 10,

1   2007." VeriSign is further required to provide ICANN with an annual report on this research and

2   development activity. These annual reports, if they exist, have not been made public.

3       39.    Under both the 2001 .com Agreement and the 2001 .net Agreement, ICANN is

4   obligated to "not unreasonably restrain competition and, to the extent feasible, promote and

5   encourage robust competition." Under the 2001 .com and .net Agreements, VeriSign makes a

6   handsome profit from its operation of the .com and .net registries. ICANN, for its part, receives

7   steady revenue from transaction fees on these registration transactions. The Internet community

8   also enjoys benefits from this arrangement in the form of a stable registration infrastructure, and a

9   competitive registration market. This stable and competitive environment has permitted the

10  development of a delicate balance between registries, registrars, back order service providers, and

11  registrants.

12      **B.    The 2005 .com Agreement**

13      40.    Defendants have agreed to terminate the 2001 .com Agreement and 2001 .net

14  Agreement and replace them with the 2005 .com Agreement and 2005 .net Agreement, which

15  destroy the competitive balance of the domain name registration industry.

16      41.    On or about October 24, 2005, VeriSign and ICANN agreed to submit the 2005

17  .com Agreement for public comment and subsequent approval by ICANN's Board of Directors.

18  On information and belief, the Board of Directors is scheduled to vote on the proposed agreement

19  during an ICANN meeting in Vancouver, Canada, that is scheduled for November 30, 2005,

20  through December 4, 2005.

21      42.    The initial expiration date of the 2005 .com Agreement is November 30, 2012.

22  The 2005 .com Agreement also provides that it will be renewed "upon the expiration of the

23  [initial term] and each later term" unless an arbitrator or court has issued a final ruling stating that

24  VeriSign "has been in fundamental and material breach of [its [the] Registry Operator's]

25  obligations" as set forth in various Sections of the 2005 .com Agreement and VeriSign has failed

26  to cure the breach within ten (10) days of the decision of the arbitrator or the court.

27      43.    The 2005 .com Agreement increases significantly the maximum price for each

28  year for new or renewal domain name registration. Until December 31, 2006, the maximum price

1  is set at $6.00. Beginning in 2007, the 2005 .com Agreement would increase the maximum price

2  by seven percent (7%) each year.

3      44.    Further, the maximum price would be defined in the 2005 .com Agreement so that

4  it does not include the "registry-level transaction fees." Therefore, the true maximum cost of

5  registering a domain name would be the maximum price plus these fees. For example, in 2006,

6  the registry fee would remain at $6.00; however, the "registry-level transaction fees" that are

7  charged by VeriSign and paid to ICANN would be added to this amount, and would be $0.37 plus

8  $0.15 for a total of $0.52 (rather than the current $0.25) from January 1 until July 1. On July 1,

9  2006, the "registry-level transaction fees" would further increase to $0.60. Thus, the total fee in

10 calendar-year 2006 would be $6.52 and then $6.60 for each registered domain name, compared

11 with the $6.25 (including fees) under the 2001 .com Agreement. On July 1 2007, the "registry-

12 level transaction fees" would further increase to $0.65. The increase in the "registry-level

13 transaction fees" allows ICANN to share in the monopoly profit generated by VeriSign's and

14 ICANN's entry into the 2005 .com Agreement. Approval of "registry-level transaction fee"

15 increases was previously part of ICANN's budget process, and registrars and other Internet

16 stakeholders had input into that process. Under the 2005 .com Agreement, the "registry-level

17 transaction fees" go up automatically without any input from registrars and other Internet

18 stakeholders.

19     45.    Unlike the 2001 .com Agreement, the 2005 .com Agreement would allow

20 VeriSign to use commercially valuable traffic data for its own commercial benefit, including

21 promoting the sale of domain names. The 2005 .com Agreement provides as follows:

22              Nothing in this Agreement shall preclude Registry Operator from
                making commercial use of, or collecting, traffic data regarding
23              domain names or non-existent domain names for purposes such as,
                without limitation, the determination of the availability and health
24              of the Internet, pinpointing specific points of failure, characterizing
                attacks and misconfigurations, identifying compromised networks
25              and hosts, and promoting the sale of domain names . . . .

26     46.    The 2005 .com Agreement would provide a new definition of "Registry Services."

27 Registry Services would be defined as: (a) services that both are offered by VeriSign on the

28 effective date of the agreement and are "operations of the registry critical to" specified tasks; (b)

1    other products or services that VeriSign is required to provide because of the establishment of a

2    "Consensus Policy"; (c) any other products or services that only a registry operator is capable of

3    providing, by reason of its designation as the registry operator; and (d) material changes to any

4    registry services in categories (a), (b), or (c). Registry services that fall within categories (c) and

5    (d) would be excluded from the provision that sets the maximum price VeriSign can charge for

6    registry services.

7         47.    The 2005 .com Agreement would also dispense with any pretense of ICANN's

8    compliance with its governmental mandate to oversee a self-regulated marketplace to assure

9    competitive and nondiscriminatory conditions. The 2005 .com Agreement would create a new

10   process for consideration of proposed registry services under which ICANN would consider

11   whether the proposed registry service "(i) could raise significant Security or Stability issues or (ii)

12   could raise significant competition issues." If ICANN determines that the proposed registry

13   service "might raise significant competition issues, ICANN shall refer the issue to the appropriate

14   governmental competition authority." The agreement further provides that "[f]ollowing such

15   referral, ICANN shall have no further responsibility, and [VeriSign] shall have no further

16   obligation to ICANN, with respect to any competition issues relating to" the proposed registry

17   service.

18        48.    Appendix 9 of the 2005 .com Agreement explicitly frees VeriSign to offer many

19   services in markets that are downstream and adjacent to the Domain Name Registration Market.

20   ICANN previously opposed some or all of these services as not permitted under the 2001 .com

21   Agreement, at least without approval from Internet stakeholders through the "Consensus Policy"

22   process. In colluding to allow VeriSign to leverage its monopoly power into these other

23   downstream and adjacent markets, ICANN has abdicated its duty to support competition, and

24   through the increase in fees paid to ICANN, stands to share in VeriSign's monopoly profits.

25        49.    One of the services listed in Appendix 9 of the 2005 .com Agreement is called the

26   Wait List Service, a service that ICANN previously contended was a breach of the 2001 .com

27   Agreement. On information and belief, VeriSign has announced its intention to launch a

28   modified and expanded version of the Wait List Service, which it has renamed the Central Listing

COMPLAINT
sf-2037455

14

1   Service ("CLS"), in December 2005.  The CLS service will affect the manner in which expired

2   .com domain names are released to the public.  Under the current system, when a .com domain

3   name is not renewed by the registrant, VeriSign automatically renews it upon expiration and gives

4   the registrar up to forty-five days to inform the registry that the domain name is to be deleted.

5   Once the registrar confirms with the registry that the domain name is to be deleted, the domain

6   name enters the redemption grace period.  During this period, a registrant who failed to renew its

7   domain name may do so upon payment of a fee above the standard registry fee.  At the end of the

8   redemption grace period, the domain name is added to the pending delete file and all of the

9   registrars are notified that it is pending deletion.  At that point, the registrars may use their back

10  order service providers to try to register the domain name on behalf of their registrants.

11        50.      Under the proposed CLS service, the pending delete period, as well as the daily

12  release of deleted domain names, will be eliminated.  Instead, VeriSign will notify all registrars

13  who have signed the CLS service agreement of the domain names to be deleted, and will hold a

14  five-day auction for all of the domain names.  If there are no bids on a particular domain name, it

15  will be released by VeriSign and can be registered as with any other previously unused domain

16  name.  If there is a successful bid for the domain name, VeriSign will deduct the bid amount (plus

17  the registry fee and any ICANN fees) from the successful registrar's account and the domain

18  name will enter a ten-day grace period designed to permit the registrar to collect the bid amount

19  from the successful registrant to complete the auction.  Although a registrar has no ownership

20  interest in a domain name, if the registrar that released the domain name has signed the CLS

21  agreement, then the registrar will receive 90% of the auction bid.  VeriSign will receive the

22  remaining 10%.

23        51.      In addition, under the current system, a registrant is permitted to return a newly

24  registered domain name within five days of registration and be refunded the full registry fee.

25  Under the proposed CLS service, this "grace period" will be eliminated.

26        52.      The 2005 .com Agreement would create a new definition of "Consensus Policies,"

27  including new limitations on what policies can be "Consensus Policies."  The effect of the new

28

limitations on "Consensus Policies" is to restrict the ability of internet stakeholders other than VeriSign to require VeriSign to act in the interest of the entire Internet community.

53.    The 2005 .com Agreement does not contain a provision that requires VeriSign to fulfill its obligation under the 2001 .com Agreement to expend a minimum of two hundred million dollars ($200,000,000) "for research, development, and infrastructure improvements to the .com, .net, and .org Registries" between May 25, 2001, and December 31, 2010.

54.    The 2005 .com Agreement does not contain the Code of Conduct in Appendix I to the 2001 .com Agreement.

55.    On the execution date of the 2005 .com Agreement, VeriSign is required to make a one-time lump sum payment of $1.25 million to ICANN, which, according to the agreement, will be used to meet the costs of implementing the agreement.

**C.    The 2005 .net Agreement**

56.    On or about June 29, 2005, VeriSign and ICANN entered into a written agreement (the 2005 .net Agreement) with respect to VeriSign's operation of the .net registry.

57.    Although the 2005 .net Agreement states that it expires six years from the effective date, it has virtually the same automatic renewal provision as the 2005 .com Agreement.  Further, the 2005 .net Agreement contains the same provisions as the 2005 .com Agreement that are alleged in paragraphs 46-54, above, which advance VeriSign's monopolies and allow ICANN and VeriSign to share in monopoly profits at the expense of consumers and other Internet stakeholders.

58.    In addition, the 2005 .net Agreement provides for a maximum price for each year of new or renewal domain name registration.  Until December 31, 2006, the maximum price is set at $4.25, which includes a $0.75 Registry-Level Transaction Fee that is paid to ICANN. Beginning in 2007, the price controls set forth in the 2005 .net Agreement will be eliminated, and the only restriction will be that VeriSign is required to charge the same price to all registrars and to offer a volume discount only if the same opportunities to participate are offered to all ICANN-accredited registrars.  Six months' prior notice is also required for any price adjustments.

1    59.    The increase in the "Registry-Level Transaction Fee" from $0.25 under the 2001

2    .net Agreement to $0.75 under the 2005 .net Agreement allows ICANN to share in the monopoly

3    profit generated by VeriSign's and ICANN's entry into the 2005 .net Agreement.

4                   **ICANN'S AND VERISIGN'S ANTICOMPETITIVE**
                   **CONDUCT IN THE RELEVANT MARKETS**
5

6    60.    The history of ICANN's oversight of the Internet domain name system has seen an

7    ever-expanding empire-building by VeriSign, most recently with ICANN's capitulation.

8    VeriSign has repeatedly taken steps to expand its limited-duration contractual monopoly over the

9    registry itself into a permanent monopoly over that registry and over markets for various domain

10   name services.  VeriSign's misconduct has included in several instances outright breaches of its

11   contracts with ICANN.  Indeed, these breaches have led to litigation between VeriSign and

12   ICANN in which ICANN brought a counterclaim alleging that VeriSign was in violation of

13   material provisions of its contracts with ICANN.  However, ICANN's resistance to VeriSign's

14   misconduct has all along been feeble, and now ICANN has capitulated entirely in return for a

15   share of the monopoly profits its acquiescence will afford to VeriSign.

16   **I.    ANTICOMPETITIVE CONDUCT IN THE DOMAIN NAME REGISTRATION**
            **MARKET**
17

18   61.    VeriSign's persistence in challenging ICANN's oversight authority has been

19   rewarded with a steady erosion of competition under ICANN.  For example, in negotiating to take

20   over operation of the .com registry in 2001, VeriSign deployed its substantial economic muscle to

21   extract from ICANN a renewal term that would make it difficult for ICANN to reopen the

22   registry contract to competitive bidding.  Now, the 2005 .com Agreement all but eliminates that

23   potential for competition, and virtually ensures VeriSign's monopoly control over that space in

24   perpetuity.  Without the threat of future open bidding on its registry operation contracts, VeriSign

25   is free to increase the prices consumers are charged for registering domain names.  In just one

26   manifestation of VeriSign's monopoly control, the proposed contract calls for an increase in

27   registration fees coupled with guaranteed annual additional increases – in perpetuity.  By contrast,

28

1    because VeriSign failed to secure similar favorable renewal terms in its initial 2001 contract to

2    operate the .net registry, VeriSign faced competitive bidding when it sought to renew the .net

3    contract earlier this year.  As a result, it was forced to agree to lower registration fees in

4    connection with that registry when it eventually won renewal of the contract.  As part of

5    VeriSign's campaign to wrest complete monopoly control, the proposed 2005 .net Agreement

6    mirrors the 2005 .com Agreement's perpetual renewal mechanism, freeing VeriSign to impose

7    monopoly pricing in .net domain names as well.

8          62.     VeriSign, insulated from the threat of future competition, has engaged in

9    monopolistic conduct that has disrupted the competitive balance of the Internet, and at times has

10   included flagrant breaches of its obligations under the existing .com and .net registry agreements.

11   For example, VeriSign has taken impermissible steps, without obtaining required consent from

12   ICANN, to introduce, *inter alia*, fee-based services, including "IDN" (international domain name)

13   and "ConsoliDate," in each case undermining ICANN's ability to maintain competitive and

14   nondiscriminatory balance in the markets for domain name services.

15   **II.    ANTICOMPETITIVE CONDUCT IN THE EXPIRING NAMES REGISTRATION**
         **SERVICES MARKET**

16

17         63.     In the context of negotiating renewal agreements, VeriSign lured ICANN away

18   from adherence to its mandate with the promise of shared profits from an ever-expanding

19   monopoly empire that the two organizations have orchestrated.  The recent round of agreements

20   and understandings between ICANN and VeriSign, as reflected in the various registry agreements

21   between the parties, violate antitrust and unfair competition laws by aiming, *inter alia*, to leverage

22   VeriSign's contractual registry monopolies into monopolies over other adjacent and downstream

23   markets, to destroy and completely transform a highly developed, functioning, and competitive

24   and marketplace for Internet domain names and related services.

25         64.     Under the 2001 .com and .net Agreements, a robust, intricately balanced, and

26   competitive industry for domain name registration developed.  At the top of the industry are

27   VeriSign's central registries of .com and .net domain names.  Usable domain names are in limited

28   supply and often have substantial commercial value.  Sometimes registrants allow their domain

1    name registrations to expire; as they expire, they are released to the public through the automated,

2    lottery-like process described above.  Registrants who want an expiring domain name place

3    orders with registrars requesting them to enter the lottery for a particular name.  The industry

4    quickly recognized that just as buying more tickets in a lottery increases the chance of winning,

5    lining up more registrars to participate in the domain name lottery on behalf of a registrant

6    increases the chance of success.  This recognition resulted in the emergence of a number of "back

7    order service providers" whose function in the marketplace is to partner with several registrars so

8    that when one of the registrars receives an order from a registrant, the back order service provider

9    can arrange to have all its "registrar partners" participate in the lottery on behalf of the registrant

10   and increase the likelihood of winning the domain name lottery.  If successful, the back order

11   service provider and its registrar partners all share appropriately in the registration fee charged to

12   the client.  The market for back order services within the Expiring Names Registration Services

13   Market is extremely competitive, and the services have been well-received by consumers.

14       65.    ICANN and VeriSign are now moving rapidly to eliminate all competition for

15   such services and share between themselves the monopoly profits that VeriSign will take by

16   excluding all other back order service providers.  Under the 2005 .com Agreement and 2005 .net

17   Agreement, VeriSign will discontinue the lottery-like process through which it currently releases

18   expiring domain names to the public.  Instead, VeriSign will implement the CLS (i.e., Central

19   Listing Service) where by it will retain all expiring .com and .net domain names, and open them

20   up for auction through a dedicated auction site.  Registrants must continue to order (or, more

21   accurately, bid for) domain names through registrars, but registrars must deal directly with

22   VeriSign in order to receive expiring names to offer to prospective clients.

23       66.    The conspiracy to terminate the existing agreements and replace them will

24   immediately and permanently substitute a complete VeriSign monopoly in place of the existing

25   competition among back order service providers, with predictable adverse price effects for

26   consumers.  At the outset, VeriSign, again with ICANN's blessing, will skim 10% off winning

27   bids, and nothing in the contracts or otherwise will prevent VeriSign from further increasing

28   prices.

COMPLAINT                                                                                    19
sf-2037455

67.    Similarly, the new agreements portend immediate and permanent adverse price consequences for consumers seeking to register (new or old) .com or .net domain names. Not surprisingly, the 2005 .com Agreement contemplates the introduction of increased charges for domain name registration. First, the fees that are paid to ICANN increase in January 2006, again in July 2006, and again in July 2007. Additionally, the 2005 .com Agreement includes an automatic perpetual annual escalator of the price VeriSign can charge that will further increase consumer prices by 7% or more; the 2005 .net Agreement eliminates any cap on registration fees whatsoever.

68.    The new auction monopoly comes at a further cost: Because there will no longer be a lottery-like process that rewards the pooling of registrars, there will no longer be a market for back order pooling services. An entire line of highly competitive commerce will be wiped out overnight (causing the complete economic destruction of the many back order service providers), only to be replaced with VeriSign's auction monopoly.

III.    **ANTICOMPETITIVE CONDUCT IN THE DIRECTORY ASSISTANCE SERVICES MARKET**

69.    Not content to rest with lucrative and anticompetive monopolies at two levels in the "distribution chain" of domain name registrations, and not content to have destroyed a competitive back order services industry, VeriSign has announced its intention to leverage its monopoly control over .com and .net domain names to create another monopoly in the market for Web address directory assistance services.

70.    Because of its monopoly control over .com and .net domain names, VeriSign has the unique position of being able to control the content for all unregistered .com and .net domain names. Under the current system, if an Internet user types in a domain name that is not registered, a standard error page will be returned. Under the proposed SiteFinder service, the standard error page will not be returned. Instead, VeriSign will have use of the entire untapped domain name market to display targeted marketing sponsored links to all Internet users.

71.    Under the SiteFinder service, VeriSign is proposing to replace the standard error page with a customized VeriSign page that states that the desired page could not be found and

offers some links to domain names with similar spellings (the "VeriSign SiteFinder page"). For example, if an Internet user types in www.bokkstore.com and the domain name is not registered, the user will be directed to a VeriSign SiteFinder page at www.bokkstore.com listing links such as www.bookstore.com or www.bkstore.com. If VeriSign has an agreement with the owners of these web sites, either directly or through a search engine, it might be paid a Pay Per Click fee for anyone who clicks through from the VeriSign SiteFinder page. This VeriSign SiteFinder page would be displayed as an active web site. Thus, when an Internet user tries to access www.bokkstore.com through a web browser, the web browser will return the VeriSign SiteFinder page.

72.    Because of VeriSign's unique position as the depository of all unregistered .com and .net domain names, only VeriSign will be able to offer consumers a "sitefinder" service, and only VeriSign (and its search engine partner) will receive revenue from sponsored links offered through "sitefinder" services. Moreover, VeriSign's proposed price increase will drive out of the market some of those who are currently active in the Pay Per Click market, resulting in more unregistered domain names that VeriSign can use for its SiteFinder service. Domain name registrants are increasingly setting up parked web pages that merely display sponsored links through which they receive revenue. These parked web pages are profitable only if they derive more revenue than they cost (with the primary cost being the registration fees). If the registry fees payable to VeriSign increase by 7% a year, as proposed under the 2005 .com Agreement, registrants will permit a number of previously profitable domain names to expire because they will no longer be profitable. Once they expire, VeriSign, which will not have to pay registry fees, will be able to use these domain names to derive revenue under its new SiteFinder service. Thus, VeriSign's new pricing structure, combined with its SiteFinder service, will put VeriSign in the unique position where it can take domain names that were previously profitable to third parties and use them to derive a profit for VeriSign.

73.    In addition, because VeriSign has eliminated the five-day grace period described above in paragraph 50, VeriSign will be in the unique position of being able to test .com and .net domain names to see if they are suitable for use in the Pay Per Click market without paying a

COMPLAINT
sf-2037455

21

1  registry fee.  If they generate sufficient traffic, VeriSign can use this information (which is solely

2  available to VeriSign as the registry) to select .com and .net domain names that it might want to

3  retain or to offer to an associated entity.  No one will be able to compete with VeriSign in this

4  market because every other registrant will have to pay the nonrefundable $6.00 or $4.25 registry

5  fee even to test traffic on an expiring domain name.

6        74.    VeriSign already deployed the SiteFinder service once, on September 15, 2003,

7  with virtually no warning to the Internet community and without seeking the approval from

8  ICANN required under the .com agreement.  Upon implementation of SiteFinder, there was

9  immediate widespread expression of concern about the impact these changes would have on the

10  security and stability of the Internet, the domain name system, and the .com registry.  An ICANN

11  advisory board consisting of roughly 20 industry experts concluded:

12            VeriSign's change appears to have considerably weakened the
            stability of the Internet, introduced ambiguous and inaccurate
13            responses in the [domain name system], and has caused an
            escalating chain reaction of measures and countermeasures that
14            contribute further instability.

15        75.    ICANN itself admitted that it was "bombarded" by letters, emails, and other

16  comments expressing concerns about the impact and appropriateness of VeriSign's SiteFinder

17  and calling for VeriSign to suspend SiteFinder voluntarily.  ICANN also intervened to request

18  that VeriSign suspend SiteFinder voluntarily.  VeriSign refused.  ICANN threatened VeriSign

19  with legal action, and VeriSign finally acquiesced and suspended SiteFinder.  Defiantly, however,

20  VeriSign announced that it would reintroduce SiteFinder at its discretion, and made clear that it

21  had no intention of turning SiteFinder off for good.

22        76.    Now, two years later, ICANN has abandoned the fight to block the launch of

23  SiteFinder and has agreed to permit VeriSign to launch SiteFinder subject only to perfunctory

24  procedural requirements.

25                                   ***

26

27        77.    With its persistent attempts to leverage its registry monopolies to create

28  downstream and adjacent monopolies in markets related to domain name registration services,

COMPLAINT                                                              22
sf-2037455

1   VeriSign is unmistakably on a mission to dominate this space. By rolling over as VeriSign flexes

2   its monopolistic muscle, ICANN is sending the powerful and equally unmistakable signal that it

3   is unwilling or unable to stop VeriSign – if you can't beat them, ICANN seems to think, you

4   might as well join them.

5        78.    This complaint is a line in the sand. The Internet community cannot survive

6   VeriSign's ICANN-endorsed game of monopoly Pacman. Unless stopped, VeriSign will, with

7   ICANN's acquiescence and participation, continue its leveraging strategy until it has eliminated

8   every competitive marketplace that it can and replaced it with a VeriSign monopoly. The result

9   will be higher prices and fewer choices for registrants, advertisers, and consumers of other

10  services related to domain names.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Monopolization Under Section 2 of the Sherman Act

### (Against VeriSign–.com and .net Registration Markets)

15       79.    Plaintiff repeats and incorporates by reference the allegations set forth above as if

16  fully set forth herein.

17       80.    For purposes of this claim, the relevant product markets are the .com and .net

18  Registration Markets. The relevant geographic markets are global.

19       81.    VeriSign has a complete monopoly in the .com and .net Registration Markets, and

20  exercises market power in those markets. VeriSign has acted alone and in concert with ICANN

21  unlawfully to maintain its monopoly indefinitely into the future in violation of Section 2 of the

22  Sherman Act, 15 U.S.C. § 2.

23       82.    VeriSign's monopoly control of the .com and .net Registration Markets has been

24  maintained and extended through exclusionary and predatory conduct.

25       83.    It is unnecessary and unreasonable for a single company to continue indefinitely to

26  maintain monopoly control over the .com and .net registries.

27

28

84.    VeriSign's unlawful conduct has caused and, unless enjoined by this Court, will continue to cause adverse and anticompetitive injury to the business and property of other stakeholders in the Internet, including CFIT's members.

## SECOND CAUSE OF ACTION

### Attempted Monopolization Under § 2 of the Sherman Act

### (Against VeriSign - .com and .net Registration Markets)

85.    Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

86.    For purposes of this claim, the relevant product markets are the .com and .net Registration Markets.   The relevant geographic markets are global.

87.    VeriSign has a complete monopoly in the .com and .net Registration Markets, and exercises market power in those markets.

88.    VeriSign has engaged in exclusionary and predatory conduct with the specific intent to extend and perpetuate its monopoly over these relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

89.    The acts done and threatened by VeriSign are exclusionary insofar as they have prevented and threaten to further prevent in perpetuity any other entity from ever competing to operate the .com and .net registries such as by offering lower prices.

90.    By virtue of VeriSign's exclusionary scheme and unlawful conduct, there is a dangerous probability that VeriSign will succeed in extending its monopoly control over the .com and .net Registration Markets in perpetuity in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

91.    If not enjoined, there is a dangerous likelihood that VeriSign's monopolization will continue, with the result that all other existing and potential competitors will be forever excluded from competition in the relevant .com and .net Registration Markets, and VeriSign will continue to impose supra-competitive price increases.

COMPLAINT
sf-2037455

24

92.     If not enjoined by this Court, VeriSign will continue to cause adverse and anticompetitive injury to the business and property of other stakeholders in the Internet, including CFIT's members.

### THIRD CAUSE OF ACTION

### Attempted Monopolization Under Section 2 of the Sherman Act

**(Against VeriSign – Expiring Names Registration
Services and Directory Assistance Services Markets)**

93.     Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

94.     For purposes of this claim, the relevant product markets are the Expiring Names Registration Services Market, and the Directory Assistance Services Market. The relevant geographic markets are global.

95.     VeriSign has a complete monopoly in the .com and .net Registration Markets, and exercises market power in those markets.

96.     The Expiring Names Registration Services Market and the Directory Assistance Services Market are currently highly competitive.

97.     VeriSign has engaged in exclusionary and predatory conduct with the specific intent to acquire and maintain unlawfully a monopoly in each of the currently competitive relevant markets, including the Expiring Names Registration Services Market and the Directory Assistance Services Market.

98.     VeriSign's unlawful monopoly, if not enjoined and restrained, will result in the elimination of competition from rival service providers such as members of CFIT, as well as supra-competitive price increases.

99.     The acts done and threatened by VeriSign pursuant to the 2005 .com Agreement, and the acts undertaken pursuant to the 2005 .net Agreement, as well as the other acts taken by VeriSign to implement this scheme, are exclusionary and predatory insofar as they preclude others from competing for the provision of registration services and directory assistance services.

1    100.    By virtue of VeriSign's exclusionary scheme and unlawful conduct, there is a

2    dangerous probability that VeriSign will succeed in gaining monopoly control over the currently

3    competitive markets for registry services and directory assistance services, in violation of

4    Section 2 of the Sherman Act, 15 U.S.C. § 2.

5    101.    If not enjoined, there is a dangerous likelihood that VeriSign's monopolization

6    will continue, with the result that all other existing and potential competitors will be forever

7    excluded from competition in the relevant Expiring Names Registration Services Market and

8    Directory Services Market , and that VeriSign will continue to impose supra-competitive price

9    increases.

10    102.    If not enjoined by this court, VeriSign will continue to cause adverse and

11    anticompetitive injury to the business and property of other stakeholders in the Internet including

12    CFIT's members.

13                    **FOURTH CAUSE OF ACTION**

14        **Conspiracy to Monopolize Under Section 2 of the Sherman Act**

15            **(Against VeriSign and ICANN – All Relevant Markets)**

16    103.    Plaintiff repeats and incorporates by reference the allegations set forth above as if

17    fully set forth herein.

18    104.    For purposes of this claim, the relevant product markets are the .com and .net

19    Registration Markets, the Expiring Names Registration Services Market, and the Directory

20    Assistance Services Market.  The relevant geographic markets are global.

21    105.    VeriSign has a complete monopoly in the .com and .net Registration Markets, and

22    exercises market power in those markets.  It is unnecessary and unreasonable for a single

23    company to continue indefinitely to maintain monopoly control over the .com and .net registries.

24    106.    VeriSign has acted in concert with ICANN unlawfully to acquire and maintain

25    VeriSign's monopoly over these relevant markets indefinitely into the future in violation of

26    Section 2 of the Sherman Act, 15 U.S.C. § 2.

27    107.    The Expiring Names Registration Services Market and the Directory Assistance

28    Services Market are currently highly competitive. VeriSign and ICANN have combined and

COMPLAINT
sf-2037455

26

1  conspired to act together to obtain monopoly power for VeriSign in each of the relevant markets.

2  In furtherance of their conspiracy, VeriSign and ICANN negotiated and entered into agreements

3  and profit-sharing arrangements whereby VeriSign and ICANN will in various ways share the

4  monopoly overcharges that the conspiracy will impose on consumers in the relevant markets.

5      108.    Defendants' conspiracy to monopolize the relevant markets has been in violation

6  of § 2 of the Sherman Act.

7      109.    Defendants' unlawful conspiracy has caused and, unless enjoined by this Court,

8  will continue to cause adverse and anticompetitive injury to the business and property of other

9  stakeholders in the Internet, including CFIT's members.

10     110.    If not enjoined, defendants' conspiracy and restraint on trade will continue.

11  **FIFTH CAUSE OF ACTION**

12  **Conspiracy in Restraint of Trade Under Section 1 of the Sherman Act**

13  **(Against VeriSign and ICANN – All Relevant Markets)**

14     111.    Plaintiff repeats and incorporates by reference the allegations set forth above as if

15  fully set forth herein.

16     112.    For purposes of this claim, the relevant product markets are the .com and .net

17  Registration Markets, the Expiring Names Registration Services Market, and the Directory

18  Assistance Services Market. The relevant geographic markets are global.

19     113.    VeriSign has a complete monopoly over the relevant .com and .net Registration

20  Markets, and exercises market power in those markets. It is unnecessary and unreasonable for a

21  single company to continue indefinitely to maintain monopoly control over the .com and .net

22  registries.

23     114.    VeriSign has acted in concert with ICANN unlawfully to restrain and eliminate

24  competition in these relevant markets indefinitely into the future in violation of Section 1 of the

25  Sherman Act, 15 U.S.C. § 1.

26     115.    The Expiring Names Registration Services Market and the Directory Assistance

27  Services Market are currently highly competitive.

28

COMPLAINT

sf-2037455

27

1    116.    VeriSign and ICANN have conspired to act together to restrain trade and

2    competition in each of these relevant markets in violation of Section 1 of the Sherman Act, 15

3    U.S.C. § 1.

4    117.    Defendants' conspiracy to restrain trade in the relevant markets has had, and

5    unless enjoined will continue to have, the effect of harming the competitive process in interstate

6    commerce.

7    118.    If not enjoined, defendants' restraint on trade will continue, with the result that all

8    other existing and potential competitors will be excluded from competing in the relevant markets

9    and consumers will be forced to pay, and continue to pay in perpetuity, supra-competitive prices

10    for the registration of .com and .net domain names.

11    119.    Defendants' conspiracy has caused, and unless enjoined will continue to cause,

12    injury to the business and property of VeriSign's existing and potential competitors and other

13    stakeholders in the Internet, including CFIT's members.

14                              **SIXTH CAUSE OF ACTION**

15        **Conspiracy in Restraint of Trade Under the Cartwright Act**

16        **(Against VeriSign and ICANN – All Relevant Markets)**

17    120.    Plaintiff repeats and incorporates by reference the allegations set forth above as if

18    fully set forth herein.

19    121.    For purposes of this claim, the relevant product markets are the .com and .net

20    Registration Markets, the Expiring Names Registration Services Market, and the Directory

21    Assistance Services Market.  The relevant geographic markets are global, including California.

22    122.    VeriSign has a complete monopoly over the relevant .com and .net Registration

23    Markets, and exercises market power in those markets.  It is unnecessary and unreasonable for a

24    single company to continue indefinitely to maintain monopoly control over the .com and .net

25    registries.

26    123.    VeriSign has acted in concert with ICANN unlawfully to restrain and eliminate

27    competition in these relevant markets indefinitely into the future in violation of the Cartwright

28    Act, California Business & Professions Code sections 16720 *et seq.*

COMPLAINT                                                                                    28
sf-2037455

124.  The Expiring Names Registration Services Market and the Directory Assistance Services Market are currently highly competitive.

125.  VeriSign and ICANN have conspired to act together to restrain trade and competition in each of these relevant markets in violation of the Cartwright Act California Business & Professions Code sections 16720 *et seq.*

126.  Defendants' conspiracy to restrain trade in the relevant markets has had, and unless enjoined will continue to have, the effect of harming the competitive process in California.

127.  If not enjoined, defendants' restraint on trade will continue, with the result that all other existing and potential competitors will be excluded from competing in the relevant markets in California and consumers will be forced to pay, and continue to pay in perpetuity, supra-competitive prices for the registration of .com and .net domain names.

128.  Defendants' conspiracy has caused, and unless enjoined will continue to cause, injury to the business and property of VeriSign's existing and potential competitors and other stakeholders in the Internet, including CFIT's members.

## SEVENTH CAUSE OF ACTION
### Unfair Competition Under Section 17200
#### (Against VeriSign and ICANN)

129.  Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

130.  Defendants, and each of them, have engaged in unlawful business acts and practices within the meaning of California Business & Professions Code section 17200 *et seq.* In particular:

1.  VeriSign has violated Section 2 of the Sherman Act by monopolizing the .com and .net Registration Markets, by its attempted monopoly of the .com and .net Registration Markets, by its attempted monopoly of the Expiring Names Registration Services Market and the Directory Assistance Service Market, by its conspiracy to monopolize all of these markets, and by its conspiracy in restraint of trade under the Cartwright Act with respect to all of these markets.

2.      ICANN has violated Section 2 of the Sherman Act by its conspiracy to monopolize the .com and .net Registration Markets, the Expiring Names Registration Services Market, and the Directory Service Market, and by its conspiracy in restraint of trade under the Cartwright Act with respect to all of these markets.

131.    ICAAN has engaged in a separate unlawful business act or practice by agreeing to Section 7.3(d)(ii), the new pricing provision of the 2005 .com Agreement. That agreement is "unlawful" because it is in violation of ICANN's charter, in particular, Section V. D.2 of the MOU, which prohibits ICANN from "unjustifiably or arbitrarily" injuring "particular persons or entities or particular categories of persons or entities." It is also in violation of Section V. D.3 of the MOU, which requires that ICANN "shall act in a non-arbitrary and reasonable manner with respect to … any … activity related to the DNS project." The pricing provision of the 2005 .com Agreement violates those requirements of the MOU because it requires an automatic annual increase of seven percent (after January 1, 2007) in the price of a domain name registration; it mandates that the price for a domain name registration can only go up but can never go down; and it imposes a pricing formula that calls for automatic price increases at a rate that is not tied to, and in fact is substantially in excess of, the historic inflation rate. Those price increases are "unjustified" and "arbitrary" and injure "particular persons or entities or particular categories of persons or entities," including but not limited to plaintiff, its members, the general public, registrars, registrants, and consumers. Those price increases also violate ICANN's covenant to "act in a non-arbitrary and reasonable manner with respect to … any … activity related to the DNS project."

132.    Defendants, and each of them, have engaged in unfair business acts and practices within the meaning of California Business & Professions Code section 17200 *et seq.* The conduct alleged herein threatens an incipient violation of the antitrust laws. The conduct alleged herein also violates the policy or spirit of the antitrust laws and violates Sections V. D.2 and V. D.3 of the MOU because its effects are comparable to or the same as a violation of the law, and it otherwise significantly threatens or harms consumers and harms competition.+++

1    133.    Plaintiff, plaintiff's members, registrars, registrants, consumers, and the general

2    public have suffered and will continue to suffer injury in fact and loss of money or property as a

3    result of defendants' acts of unfair competition as alleged above.

4                              **EIGHTH CAUSE OF ACTION**

5                      **Cybersquatting Under 15 U.S.C. Section 1125(d)**

6                                    **(Against VeriSign)**

7    134.    Plaintiff repeats and incorporates by reference the allegations set forth above as if

8    fully set forth herein.

9    135.    Plaintiff is the owner of valid trademarks, COALITION FOR ICANN

10   TRANSPARENCY and CFIT.  Plaintiff is also the owner of the "www.cfit.info" domain name,

11   where it operates an informational web site.  Plaintiff also owns the domain names

12   "www.citf.org" and "www.coalitionforicanntransparency.com," which it uses to direct Internet

13   users to "cfit.info."  Plaintiff had rights to these marks prior to VeriSign's proposed launch of the

14   SiteFinder web site.

15   136.    If VeriSign's SiteFinder service is launched, VeriSign will be a cybersquatter in

16   violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(d).

17   137.    VeriSign controls all unregistered domain names.  Many of these domain names

18   are identical or confusingly similar to valid trademarks.  If the SiteFinder service is launched,

19   VeriSign will use these domain names to intercept traffic by users who misspell valid domain

20   names.  For example, "www.coalitionforiccantransparency.com," which is currently unregistered

21   and not linked to an active web site, would be resolved to VeriSign's SiteFinder site.

22   138.    VeriSign intends to profit in bad faith from the goodwill of marks such as those

23   owned by plaintiff.  VeriSign will use confusingly similar marks in its control to direct users who

24   mistype or misspell valid trademarks to its SiteFinder web site.   As a direct and proximate result

25   of VeriSign's wrongful conduct, plaintiff will be deprived of the value of its marks as commercial

26   assets.

27   139.    Unless VeriSign is enjoined from engaging in its wrongful conduct, plaintiff will

28   suffer irreparable injury and harm for which it has no adequate remedy at law.

COMPLAINT
sf-2037455

1

## NINTH CAUSE OF ACTION

2

### Intentional Interference with Prospective Economic Advantage

3

### (Against VeriSign and ICANN)

4        140.    Plaintiff repeats and incorporates by reference the allegations set forth above as if

5   fully set forth herein.

6        141.    Registrars and back order service providers have established contractual

7   relationships through which they offer back order services in the Expiring Names Registration

8   Services Market to assist registrants in securing expired domain names.  Plaintiff's members

9   include such registrars and back order service providers.

10       142.    Defendants are aware that plaintiff's members are offering such services.

11       143.    Defendants' conduct is willful and constitutes intentional interference with the

12   economic relationships among plaintiff's members and with their current and prospective

13   customers.

14       144.    Defendants' conduct is in violation of the antitrust laws and section 7200 of the

15   California Business & Professions Code.

16       145.    Plaintiff's members who operate in the Expiring Names Registration Service

17   Market will be damaged as a result of defendants' interference with their prospective economic

18   advantage because the CLS service will eliminate the need for back order service providers.

19       146.    Plaintiff's members will suffer economic losses under the 2005 .com and .net

20   Agreements.  Defendants' wrongful conduct will be the direct and proximate cause of such

21   losses.

22       147.    Unless defendants are enjoined from engaging in their wrongful conduct, plaintiff

23   will suffer irreparable injury and harm for which it has no adequate remedy at law.

24

25

26

27

28

COMPLAINT                                                                                    32
sf-2037455

1
**PRAYER**

2  WHEREFORE, CFIT prays for judgment as follows:

3      1.      For a declaration that the 2005 .com Agreement is unlawful and in violation of

4  Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; the Cartwright Act, California

5  Business & Professions Code sections 16720 *et seq.*; and the California Unfair Competition Act,

6  California Business & Professions Code sections 17200 *et seq*;

7      2.      For a declaration that Section 3.1(b)(v) (the limitations on Consensus Policies),

8  Section 3.1(d) (the definition of Registry Services), Section 4.2 ("Renewal"), and Appendix 9

9  (explicitly authorizing the provision of specified new services) of the 2005 .net Agreement are

10  unlawful in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; the

11  Cartwright Act, California Business & Professions Code sections 16720 *et seq.*; and the

12  California Unfair Competition Act, California Business & Professions Code section 17200 *et seq*;

13      3.      That the Court adjudge and decree that VeriSign has monopolized the interstate

14  trade and commerce in the relevant markets in violation of Section 2 of the Sherman Act, 15

15  U.S.C. § 2;

16      4.      That the Court adjudge and decree that VeriSign has attempted to monopolize the

17  interstate trade and commerce in the relevant markets in violation of Section 2 of the Sherman

18  Act, 15 U.S.C. § 2;

19      5.      That the Court adjudge and decree that ICANN and VeriSign have combined and

20  conspired to monopolize interstate trade and commerce in the relevant markets in violation of

21  Section 2 of the Sherman Act, 15 U.S.C. § 2;

22      6.      That the Court adjudge and decree that ICANN and VeriSign have combined and

23  conspired to restrain the interstate trade and commerce in the relevant markets in violation of

24  Section 1 of the Sherman Act, 15 U.S.C. § 1;

25      7.      That the Court adjudge and decree that ICANN and VeriSign have combined and

26  conspired to restrain trade, and to have formed a trust, in violation of the Cartwright Act,

27  California Business & Professions Code §§ 16720 *et seq.*;

28      8.      That the Court adjudge and decree that ICANN and VeriSign have engaged in

unfair, unlawful, and fraudulent conduct in violation of the California Unfair Competition Act, California Business & Professions Code section 17200 *et seq.*;

9.     That Defendants and all persons, firms, and corporations acting on their behalf and under their direction or control be permanently enjoined from engaging in, carrying out, renewing or attempting to engage, carry out, or renew, any contracts, agreements, practices, or understandings in violation of the Sherman Act, the Lanham Act, the Cartwright Act, or the Unfair Competition Act, and specifically including, without limitation, the provisions of the 2005 .com Agreement and Section 2.4 "Renewal" of the 2005 .net Agreement;

10.     That VeriSign be enjoined and prohibited from engaging in any "Registry Services" as defined in the 2005 .com Agreement except for services that are defined as "Registry Services" in the 2001 .com Agreement;

11.     That VeriSign be ordered to divest promptly and in any event within 90 days the registry business and all assets used or reasonably necessary to its operation to a separate company that will be prohibited from engaging in any business except for services that are defined as "Registry Services" in the 2001 .com Agreement;

12.     That ICANN be prohibited from approving any service offered by VeriSign, its divestee, or any future party operating the .com or .net registries where the effect may be to tend to create a monopoly, to substantially harm competition, or to restrain trade and competition in any line of commerce;

13.     That CFIT and other third parties who shall have been or might be injured in their business or property as a result of any violation by ICANN or Verisign of any of the provisions of the Court's order, be specifically authorized to enforce the provisions of thereof in this Court, including without limitation pursuant to the antitrust laws of the United States as well as any applicable state antitrust or unfair competition laws;

14.     That VeriSign and ICANN be ordered to abide by the terms of the current .com Agreement until it expires on November 10, 2007, and that ICANN be ordered to entertain competing bids for the operation of the .com registry at that time;

COMPLAINT
sf-2037455

34

1        15.    That VeriSign and ICANN be ordered and required to comply with the price

2  provisions of Appendix G of the 2001 .com Agreement, and the Code of Conduct provisions of

3  Appendix I of the 2001 .com Agreement and 2001 .net Agreement;

4        16.    That VeriSign and ICANN be ordered and required to comply with the research

5  and development provisions of Appendix W of the 2001 .com Agreement and make public the

6  required annual reports thereunder;

7        17.    That plaintiff have such other relief as the Court may consider necessary or

8  appropriate to restore competitive conditions in the markets affected by defendants' unlawful

9  conduct; and

10       18.    That plaintiff recover the costs of this action.

11  Dated: November 28, 2005

12                       MORRISON & FOERSTER LLP

13

14                       By:

15                            Jesse W. Markham, Jr.

16                       Attorneys for Plaintiff
                              COALITION FOR ICANN

17                       TRANSPARENCY INC.

18

19

20

21

22

23

24

25

26

27

28